### UNITED STATES v. HAWTHORNE et al.
#### (two cases).
#### Nos. 214, 217.

District Court, N. D. Texas, Dallas Division. March 11, 1940.

828

John S. L. Yost and W. Carroll Hunter, Sp. Assts. to Atty. Gen., and Clyde O. Eastus, U. S. Atty., and John A. Erhard, Asst. U. S. Atty., both of Dallas, Tex., for plaintiffs.

S. L. Lewis, of Dallas, Tex., for defendants.

ATWELL, District Judge.

The plaintiffs declare upon three bonds; two in No. 214, and one in No. 217. These bonds were given by the defendants, who had planted cotton in excess of their allowable quota, and were not, therefore, entitled to white marketing cards which allowed them to sell their cotton without the payment of any excess tax to the buyer, for remission to the Secretary of Agriculture. They held red cards which required the collecting of the excess tax of two cents per pound by the buyer.

In order to avoid this inconvenience, they agreed in each of the bonds that they would pay the excess tax at the conclusion of the season, the amount of which was estimated in the face of the bond, and thus save the inconvenience of reports and payments upon each sale. In each obligation they agreed that the statutes and regulations under which the bonds were given, were valid, that the cotton produced on the farms would be marketed subject to the penalty, and that such penalties would be paid when due and payable in accordance with the statute and regulations. There are no reservations on the part of either the principals, or the sureties.

The only question open on the bonds is, the exact amount marketed, and the figuring of the amount due thereon. This issue is removed by the admission in the answer in each case, that the amount alleged to have been marketed under such bond is correct. The admission in No. 217 is, "The defendants would show that the estimates of the cotton marketed under serial No. 5065 is approximately correct." The admission in No. 214 is, "The defendants would show that the estimates of cotton marketed under serial No. 5066, is approximately correct, and that the cotton marketed under serial No. 5067, is incorrect and should be 119,527 pounds." The serial number mentioned in each of the answers relates to the number given the farm of the defendants in each case. The admission as to the 119,527 pounds is a larger amount than the plaintiff had claimed was marketed.

The defenses pleaded in each case are constitutional questions. There are ten of them. The first challenges the Act of 1938 as being in violation of Article 1, Section 1 of the Constitution, in that, "there is a failure of legislative responsibility," that it is not a completed act by either the Congress, or the Secretary of Agriculture. That there is no law for a referendum. That there is no class of "federal voters." That it is violative of the exclusive control of the right of suffrage vested in the states. That it is a disfranchisement of the majority of qualified voters in the various states. Second: That the Act is violative of Article 1, § 8, clause 3, of the Constitution, "which guarantees commerce between the several states." That the same attempts to regulate the production and sale of agricultural products. That it illegally delegates power to the Secretary of Agriculture to fix allotments in nation, state, county, and farm. Third: The same is invalid under "Article 1, Section 9, clauses 4, 5, and 6, of the Constitution." The answer continues then in the fourth, fifth, six, seventh, eighth, ninth, and tenth defenses to challenge as unconstitutional. Many details are indulged and many clauses of that instrument are cited, including many of the amendments beginning with the fifth, and ending with the nineteenth.

In No. 214, the defendants plead a counter-claim. They claim in 1935 while raising cotton under the Bankhead Act, which is now repealed, that the defendant

received tax-free certificates, "in the aggregate amount of 74,385 pounds of tax-free lint cotton." They say that at that time they had a value "of 2½ cents to 3 cents per pound." That he was approached by agents, servants, and employees of the Department of Agriculture "under what they termed the 'national surplus cotton tax exemption certificate pool.'" That they guaranteed to him the payment of four cents per pound. That since the delivery of said certificates they have received one and one-tenth cent per pound on said certificates, and that they have been damaged in the sum of $2,158.05, or, in the alternative, in the sum of $1,414.20.

Motion for summary judgment under Rule 56, 28 U.S.C.A. following section 723c, is made by the plaintiff in each case. That rule, in sub-section (c), provides for such action, if "there is no genuine issue as to any material fact."

■ Before the motion can be ruled, the counter-claim must be considered. It does not appear that the United States is a proper party, nor that it has consented to be sued, nor that the conditions set forth in Section 774, Title 28, U.S.C., 28 U.S.C.A. § 774, for the making of a counter-claim in any suit brought by the United States, have been met. The vagueness of the pleading of this claim may be somewhat aided by reference to Thompson v. Deal, 67 App.D.C. 327, 92 F.2d 478. The Bankhead certificates issued under 48 Stat. 598, were sometimes not marketable because of a bad season. There was a provision for the disposition of the same for cash to producers who had more cotton. In order to facilitate this, a surplus cotton tax exemption pool was established into which certificates could be deposited, and from which they could be purchased at a price slightly lower than the tax. The pool was under the general supervision of the Secretary of Agriculture, but was operated by one Deal, with whom each depositor entered into a written trust agreement. The United States had no interest in the pool. Deal could have been sued in his individual capacity as trustee.

■ The Bankhead Cotton Act created no claim, nor did it pledge the faith of the United States. The claim is not founded upon any regulation of an executive department. When the Act was repealed, 49 Stat. 1106, it took away whatever rights it created. A regulation dies with the statute from which it gains its life.

■ The United States is not liable for unauthorized acts of its agents. The pool manager had no authority to take, or accept tax exemption certificates, except under a trust agreement, and such control could not give rise to even an implied obligation to pay for them.

This summary treatment of the counter-claim and suggestions made herein, are supported by such cases as Nassau Smelting & Refining Works v. United States, 266 U.S. 101, 45 S.Ct. 25, 69 L.Ed. 190; United States v. Thekla, 266 U.S. 328, 45 S.Ct. 112, 69 L.Ed. 313; United States v. Skinner & Eddy Corp., 9 Cir., 35 F.2d 889; In re Hall, 167 U.S. 38, 17 S.Ct. 723, 42 L.Ed. 69; Lynch v. United States, 292 U.S. 571, 54 S.Ct. 840, 78 L.Ed. 1434; Brown v. Fletcher, 235 U.S. 589, 35 S.Ct. 154, 59 L.Ed. 374; Sutton v. United States, 256 U.S. 575, 41 S.Ct. 563, 65 L.Ed. 1099, 19 A.L.R. 403; Alabama v. United States, 282 U.S. 502, 51 S.Ct. 225, 75 L.Ed. 492; United States v. Algoma Lumber Co., 305 U.S. 415, 59 S.Ct. 267, 83 L.Ed. 260; Baltimore & O. R. Co. v. United States, 261 U.S. 592, 43 S.Ct. 425, 67 L.Ed. 816; United States v. Cantrall, C.C., 176 F. 949; Western Union Railroad Co. v. United States, 101 U.S. 543, 25 L.Ed. 1068; Smythe v. United States, 188 U.S. 156, 23 S.Ct. 279, 47 L.Ed. 425; Fisher Flouring Mills v. United States, 9 Cir., 17 F.2d 232; Shaw v. United States, 6 Cir., 75 F.2d 175; North Dakota-Montana W. G. Ass'n, v. United States, 8 Cir., 66 F.2d 573, 92 A.L.R. 1484.

It follows that the motion to dismiss the counter-claim must be sustained.

■ The constitutional questions raised in the ten defenses, if they were good, could not prevent summary judgment, because the defendants accepted the benefits of the statute which they now challenge. Moor v. Texas & N. O. R. Co., 5 Cir., 75 F.2d 386, affirmed 297 U.S. 101, 56 S.Ct. 372, 80 L.Ed. 509; Booth Fisheries Co. v. Industrial Comm., 271 U.S. 208, 46 S.Ct. 491, 70 L.Ed. 908. This doctrine goes back as far as Daniels v. Tearney, 102 U.S. 415, 26 L.Ed. 187. See, also, Grand Rapids & I. R. Co. v. Osborn, 193 U.S. 17, 24 S.Ct. 310, 48 L.Ed. 598; Nuckolls v. United States, 10 Cir., 76 F.2d 357; Yarnell v. Hillsborough Packing Company, 5 Cir., 70 F.2d 435.

Furthermore, this Act, which relates to the five crops of cotton, rice, tobacco, corn, and wheat has been carefully scrutinized by the Supreme Court in Mulford v. Smith,

307 U.S. 38, 59 S.Ct. 648, 83 L.Ed. 1092, insofar as its control of tobacco is concerned, and has been upheld. It should also be observed that if a farmer is not satisfied with his quota, he has the right of appeal from the action of the administrative board to a court. No such relief was sought here.

This court is deeply sensible of the cringing reluctance with which the free citizen looks upon regulations by the national government with reference to what he can, and cannot, plant. It is antagonistic to our inbred and inborn notions of freedom and liberty. The very thought that one must have a card of some particular color before he is free to market his cotton without supervision, is distasteful. But, the Constitution gives the Congress power over interstate commerce, and this Act has been generated in and out of that authority. If the citizen forges his own fetters by the acceptance of gratuity checks, and by the failure to act in protest in the manner given him (Gorham v. Tax Comm., 266 U.S. 265, 45 S.Ct. 80, 69 L.Ed. 279), and by dealing in harmony with the statute for his own betterment, he cannot expect to receive help from the court. He has irrevocably bound himself. The best that a trial court can do is to rule the case upon authorities which must control, without giving his support to the Act, and without passing upon questions that are unnecessary for the determination of the case. United States v. Whittenberg, D.C., 21 F. Supp. 713.

The motion for summary judgment in each case must be granted.